James D. Weakley, Esq.   Bar No. 082853
Ashley N. Reyes, Esq.    Bar No. 312120
David Gonzalez, Esq.     Bar No. 333121
**WEAKLEY & ARENDT**
A Professional Corporation
5200 N. Palm Avenue, Suite 211
Fresno, California 93704
Telephone: (559) 221-5256
Facsimile:  (559) 221-5262
Jim@walaw-fresno.com
Ashley@walaw-fresno.com
David @walaw-fresno.com

Attorneys for Defendant, County of Fresno, which includes Fresno County Sheriff's Department

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ERNEST O'NEIL RANKIN BROCK, | ) CASE NO. 1:18-CV-01615-DAD-EPG |
| Plaintiff, | ) |
| vs. | ) DECLARATION OF JAMES D. WEAKLEY |
| | ) IN SUPPORT OF DEFENDANT'S MOTION |
| | ) FOR SUMMARY JUDGMENT |
| COUNTY OF FRESNO on behalf of FRESNO | ) |
| COUNTY SHERIFF'S DEPARTMENT; and | ) |
| DOES 1-200, inclusive, | ) Date:  May 3, 2022 |
| | ) Time: 9:30 a.m. |
| Defendants. | ) Ctrm: 5 |
| | ) The Honorable Dale A. Drozd |
| | ) |

I, James D. Weakley, declare as follows:

1.     I am an attorney at law, duly licensed to practice before the courts in the State of California and the United States District Court, Eastern District of California.  I am a partner with the law firm of Weakley & Arendt, attorneys for Defendant County of Fresno in the above-entitled action.  I have personal knowledge of the matters set forth herein, except those matters stated on information and belief, and if called as a witness could competently testify thereto.

2.     This declaration is made in support of Defendant's motion for summary judgment or alternatively, summary adjudication.

---

Declaration of James D. Weakley
in Support of Defendant's MSJ

3.      Attached hereto as Exhibit 1 is a true and correct copy of portions of the transcript of the deposition of Captain Russell Duran (Vol. 1), taken on April 16, 2021[1].

4.      Attached hereto as Exhibit 2 is a true and correct copy of portions of the transcript of the deposition of Captain Russell Duran (Vol. 2), taken on April 21, 2021.

5.      Attached hereto as Exhibit 3 is a true and correct copy of portions of the transcript of the deposition of Corporal Troy Burks, taken on July 16, 2021.

6.      Attached hereto as Exhibit 4 is a true and correct copy of portions of the transcript of the deposition of Sergeant Mary Nichols, taken on July 16, 2021.

7.      Attached hereto as Exhibit 5 is a true and correct copy of portions of the transcript of the deposition of Assistant Sheriff Steve McComas, taken on March 30, 2021.

8.      Attached hereto as Exhibit 6 is a true and correct copy of portions of the transcript of the deposition of Ernest Brock, Jr., taken on July 5, 2021.

9.      Attached hereto as Exhibit 7 is a true and correct copy of portions of the transcript of the deposition of Tabitha Rankin, taken on July 5, 2021.

10.     Attached hereto as Exhibit 8 is a true and correct copy of portions of the transcript of the deposition of Karen Norris, taken on July 7, 2021.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on March 22, 2022, at Fresno, California.

/s/ James D. Weakley

James D. Weakley

---

[1] Both volumes of Captain Duran's deposition transcripts were placed under the protective order at the time of his deposition with the agreement that defense counsel would review the testimony for areas that needed the confidentiality protection. I have reviewed the testimony cited to and attached to this declaration and verify that the testimony is not confidential.

Declaration of James D. Weakley
in Support of Defendant's MSJ                    2

# WEAKLEY

# EXHIBIT 1

Case 1:18-cv-01615-LHR-EPG Document 55-3 Filed 03/22/22 Page 4 of 89

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA - FRESNO DIVISION

ERNEST O'NEIL RANKIN BROCK,    )
             )
    Plaintiff,    )
             )
  vs.         ) No. 1:18-cv-01615-DAD-EPG
             ) Pages 1 - 177
COUNTY OF FRESNO on behalf of )
FRESNO COUNTY SHERIFF'S    )
DEPARTMENT, and DOES 1-200,  )
inclusive,        )
             )
    Defendants.   )
_____)

**Confidential Pursuant to Protective Order**

ZOOM VIDEOTAPED DEPOSITION OF

RUSSELL DURAN, Volume I, a witness herein,

called for examination by counsel for

Plaintiff in the above-styled matter, the

witness being duly sworn by Leslie L. White,

CSR 4148, State of California, taken via Zoom

videoconference, at 10:05 a.m., Friday,

April 16, 2021, and the proceeedings being

taken down by stenotype by Leslie L. White,

CSR, and transcribed under her direction.

Case 1:18-cv-01615-LHR-EPG     Document 55-3     Filed 03/22/22     Page 5 of 89

APPEARANCES

On behalf of the Plaintiff:

LAW OFFICES OF LOYST P. FLETCHER, ESQ.
BY:  CAITLIN SCOTT, ESQ.
BY:  LOYST P. FLETCHER, ESQ.
555 West 5th Street
35th Floor
Los Angeles, California 90013
   TELEPHONE (424) 231-2864
   E-MAIL cscott@lpfletcherlaw.com
        loyst@lpfletcherlaw.com


                -AND-

On behalf of the Plaintiff:

CHANDLER LAW
BY:  STUART CHANDLER, ESQ.
761 East Locust Avenue
Suite 101
Fresno, California 93720
   TELEPHONE (559) 431-7770
   EMAIL stuart@chandlerlaw.com


On behalf of the Defendants:

WEAKLEY & ARENDT APC
BY:  JAMES WEAKLEY, ESQ.
5200 North Palm Avenue
Suite 211
Fresno, California 93704
   TELEPHONE (559) 221-5256
   EMAIL jim@walaw-fresno.com


Also Present:

        CURTIS ANDRUS, Videographer

and other criteria for the purpose

of maintaining the safety of

inmates, staff, the security of the

jail facilities and public safety."

Did I read that correctly?

A     Yes, you did.

Q     After reading the different factors that are -- that play into classifying inmates in custody, are there any of these I mentioned after reading the purpose that are weighed more than any of the other categories?

So, for example, the inmate's sex is obviously going to determine largely where they are placed because men and women are aren't placed in the same housing unit; right?

A     That's correct.

Q     Okay.  So in terms of age, criminal sophistication, seriousness of crime charged, how -- and the other factors that I mentioned, how much do those factors play into where an inmate is housed at the Fresno County Jail pursuant to this policy?

A     Those descriptions of those factors are -- correlate to the sections of the objective classification system, which all of those areas are taken into consideration in classifying and housing

Trustpoint.One | Alderson
www.trustpoint.one
www.aldersonreporting.com
800.FOR.DEPO
(800.367.3376)

Russell Duran

CONFIDENTIAL
PURSUANT TO PROTECTIVE ORDER

4/16/2021

Page 66

Case 1:18-cv-01615-LHR-EPG    Document 55-3    Filed 03/22/22    Page 7 of 89

inmates.

Q    What does "objective classification" mean?

A    Objective Classification is a -- it's an objective system based on a point total.  So our system -- when we classify inmates we ask every inmate that we're classifying the same questions, and it scores them identical based on the criteria.

Q    What is the purpose -- do you know the purpose of asking inmates the same questions?

A    So this point system for the objective classification system is a system that -- so it fairly scores the inmates, based on the same criteria --

        (Reporter clarification.)

        THE WITNESS:  The same criteria.  So that all inmates are asked the same questions, so it's not arbitrary questions when scoring those inmates on the objective system.

BY MS. SCOTT:

Q    Before this policy was revised and distributed on February 18th, 2017, did Fresno County use an objective system of classification for inmates?

A    Yes, we did.

Q    Based on this point system that you

Case 1:18-cv-01615-LHR-EPG    Document 55-3    Filed 03/22/22    Page 8 of 89

explained?

A    Yes.

Q    Okay.  The policy reads that, (Reading):

"All inmates shall be classified after the booking process is completed and prior to their placement into a housing unit."

What is a "housing unit"?

A    A housing unit is a place in our facility where -- when inmates are determined that they are not going to be released from Booking, then they get assigned a housing unit, which is a floor or a particular area within the jails that they are going to stay, and I guess, for lack of a better term, live while they are in our custody of the jail.

Q    So based on this point system how does an inmate -- how does an inmate end up in, say, General Population versus something like Protective Custody, in terms of housing?

A    So there are also factors that have to be considered with housing, like gang associations, or when it comes to Protective Custody there are certain issues that can be identified by the Classification officers that may cause an inmate to have problems in General Population.

So we identify those.  And some examples of those would be like gang dropouts, inmates with sex charges or other sensitive type charges.  It could be inmates who are identified as, in collaboration with mental health, as psychiatric inmates.

So those are -- we have Protective Custody based on some of those factors that are separate from the General Population.

Q    Where are Protective Custody inmates typically housed within the Fresno County Sheriff's Office?

A    So we have various units that are designated as Protective Custody.  We have -- we currently have three jail facilities, and there are different Protective Custody units in each of those facilities.

Q    Well, with respect to the Main Jail, where is the protective custody in that facility?

A    So right now the Main Jail, we have Protective Custody inmates in some of the pods on our sixth floor.  Trying to think where else right now.  I think that might be the only floor that we have Protective Custody housing units.

Q    Do you know what housing unit had

Case 1:18-cv-01615-LHR-EPG    Document 55-3    Filed 03/22/22    Page 10 of 89

Protective Custody inmates in January of 2018?

A    Not off the top of my head, no, I do not.

Q    Okay.  Is there somewhere you would be able to look to find that information?

A    Out of the documents available to me today, no.  But there is -- I mean, we have -- we have documents from past that tell us what each housing unit was assigned as back in 2018.

Q    Okay.  Do you know what -- do you know if the fourth floor of the Main Jail Pod A was a Protective Custody housing unit in January 2018?

A    So for clarification, that was an Ad Seg housing unit, which is different than a regular Protective Custody housing unit.

And I know sometimes it is hard for people to understand the difference, but for our purposes of housing, Protective Custody Housing is considered an open housing unit, which can be either a dormitory or a cell living housing unit that a group of inmates who are deemed to be compatible or similar circumstances live together in open setting.

And then you have Administrative Segregation where Protective Custody inmates can be housed if they are not housed in the open Protective Custody units.

Trustpoint.One | Alderson
www.trustpoint.one
www.aldersonreporting.com
800.FOR.DEPO
(800.367.3376)

Case 1:18-cv-01615-LHR-EPG    Document 55-3    Filed 03/22/22    Page 11 of 89

So back to your question the Main Jail 4A housing unit was an Ad Seg housing unit.

Q    Meaning that they don't live, or they are not housed openly.  They have to be in a cell with either their cellmate or by themself?

A    That is correct.

Q    And then the Ad Seg -- can you, just for purposes of clarifying on the record, what Ad Seg -- that's short for something; right?

A    It's Administrative Segregation.

Q    Okay.  So Administrative Segregation, otherwise known as Ad Seg, is for inmates that for one reason or another they can't be housed in a group setting, so they have to be isolated either by themselves or isolated with their cellmate, and then they are allowed into either the showers or the day room only with themselves or other inmates; right -- or they are either by themselves or with their cellmate specifically, but not with other inmates at the Fresno County Jail?

A    That is correct.

The Ad Seg cells -- the way that housing unit operates is one -- one cell is open at a time. And then if there is inmates in the day room, before you let out or open another cell, those inmates out

Case 1:18-cv-01615-LHR-EPG    Document 55-3    Filed 03/22/22    Page 12 of 89

But for clarification, the objective classification calculations, between those two systems when that system came online, the computation was calculated the same at that time period.

Q    When an inmate who has been classified based on the numerical value for sexual-related charges, are they able to be housed with inmates who have not been charged with sexual crimes?

A    So the inmates, they would -- the system would identify them as Protective Custody inmate, and then the housing decision becomes more what the Classification officer does, based on the totality of it.

So for people with sex crimes they go into what we call our Protective Custody Charges Housing.

And it is not just specific to sex charges.  There could also be other people in there that are -- have sensitive charges that need protection from General Population.

Q    And that could be because it is a gang dropout or something -- something along those lines?

A    So our -- for Fresno County Jail, and like you had referred earlier all jail or all correctional facilities have some differences.  But

Case 1:18-cv-01615-LHR-EPG     Document 55-3     Filed 03/22/22     Page 13 of 89

for our housing purposes of what we have found over the years and worked to make compatible groups that can house and co-habitate together, the gang dropouts have kind of their own Protective Custody housing units.  The Charges inmates would be people who are -- it could include sex charges.  It could include sensitive charges, like abuse of a child.  It could be elder abuse.  Those are I will say sensitive cases that sometimes in General Population we have seen causes those inmates problems in the past.

So we created this one housing unit for them to live together while they are in our custody.

Q    What was that housing unit that was created?

A    That's called the PC Charge Unit.

Q    And you said currently -- currently the PC Charge Unit is on the sixth floor of the Main Jail; is that right?

A    Well, current -- now there are PC units on the Main Jail sixth floor.  I will tell you currently there are PC Charge Units in our North Jail facility.  I don't know the exact floors offhand.  We have four floors over in that facility.

But there are PC Charges there, and I

Case 1:18-cv-01615-LHR-EPG    Document 55-3    Filed 03/22/22    Page 14 of 89

versus not convicted.

Q    What about inmates who have been referred to a state hospital because for one reason or another they have been court ordered to a state hospital, are they separated from inmates in any way?

A    No.  The fact that somebody is ordered to a state hospital does not dictate that they would move to a separate area from the jail just because they were ordered to a state hospital.

Q    Do you know -- back to the way that the computer program calculates the classification, when an inmate comes into the Fresno County Jail, is there someone who is asking the potential inmate, or whoever it is, these questions, are they in front of the computer, or do they have a handwritten sheet, and then they take it, and then they input the information into the computer separate from the interview process?

MR. WEAKLEY:  I'm going to object as compound, but go ahead and answer if you can.

THE WITNESS:  So the process of a Classification officer when they are going to classify somebody that is going to stay in custody is they start reviewing information that they can

find about that inmate prior to interviewing the inmate.

And that also includes, like, running their criminal history to look for convictions and that sort of information. And then when they gather preliminary information, then there is an interview -- classification interview document that they go out and physically face-to-face interview the person that was going to stay in our custody. And that is not done with the computer at side. That is just a face-to-face interview where they mark their responses on that form.

And then the information that they gather from there is used in combination of their research prior to fill out the classification assessment form in our system that generates the point total for an inmate.

BY MS. SCOTT:

Q   Okay. So there is a handwritten form that is filled out during the interview process with an inmate during the initial booking process?

A   That is correct.

Q   And on that form there are -- there are questions that the person conducting -- well, who conducts that interview, first of all?

Case 1:18-cv-01615-LHR-EPG     Document 55-3     Filed 03/22/22     Page 16 of 89

A     Yes. Well, everybody gets the review at 30 days. Everybody gets that. And then it was 90 days after that for those open housing units.

Q     Okay. Can you explain what an "open housing unit" is? You used that term before, but I just want to understand exactly what you mean when you say "open housing unit."

A     Basically not Administrative Segregation. Housing units where the inmates either all commingle together, like in a dormitory housing, or in a housing unit that has cells that the cells are normally open all at the same time where the inmates can commingle in a common area.

Q     Okay. But you did mention that there are protective housing units where inmates are able to commingle with -- in an open space with people other than just themselves or their cellmate; right?

A     There are other Protective Custody housing units that are like that, yes.

Q     Okay. So is there a differentiation between Protective Custody housing units that are open, and the open housing units that you're referring to?

A     No, they are the same thing. I sometimes interchange when I say open and General Population,

Trustpoint.One | Alderson      www.trustpoint.one
www.aldersonreporting.com      800.FOR.DEPO
(800.367.3376)

Case 1:18-cv-01615-LHR-EPG    Document 55-3    Filed 03/22/22    Page 17 of 89

so . . .

Q    Okay.  And I'm just trying to clarify because this is -- yeah, I just want to make sure that you're not using the term in one sense, and then it is not used interchangably.  But it sounds like it is used interchangeably, at least in your experience.

Okay.  When an inmate is in Protective Custody, there is a differentiation between a Protective Custody inmate, and someone who is in Administrative Segregation; right?

A    Yes, there is a difference.

Q    Okay.  So under Protective Custody there could be urban housing under sort of one tier, and then Administration Segregation under another tier; right, but they could both be Protective Custody status; right?

MR. WEAKLEY:  Do you understand the question?

THE WITNESS:  Yeah, say that again.

BY MS. SCOTT:

Q    Okay.  So you have got -- if you have a Protective Custody inmate, that's what they have been classified as, and then you have Protective Custody, but that inmate is classified in an open

Case 1:18-cv-01615-LHR-EPG    Document 55-3    Filed 03/22/22    Page 18 of 89

housing unit, there is a difference between an inmate who is in Protective Custody, and someone who is in Administrative Segregation under protective housing -- or Protective Custody, I'm sorry?

A    The main difference would be that in the Ad Seg portion of it they are in a locked cell versus able to come out of their cell.

Q    Okay.  And so when someone comes out of their cell in Administration Segregation, if they are housed with another cellmate in Administrative Segregation housing, do they come out with the cellmate, or are they allowed out only one at a time?

A    They are allowed out together.  But there are times where maybe only one of the cellmates has an event to go to where they are taken out of their cell by themselves because they are going to a specific event just for them.

Q    Okay. And "event" you're referring to -- what are you referring to?

A    That could be a visit, a medical sick call.  It could be something -- an interview with their probation officer or whatever.  It's something specific to just them and not their cellmate.

Q    Okay.  Is a shower something that would be

BY MS. SCOTT:

Q    Okay.  Is there -- well, strike that.

What is the goal of classifying inmates -- well, is there a goal for classifying inmates?

A    Well, the system is used to, like I said, house inmates, and the system is designed to house inmates in the lowest custody level possible.  So -- and to have a consistent way of housing inmates so it is not all just a subjective view of where to put people.

Q    Is there some subjective criteria that plays into classification of inmates, at least since you have been involved with the special unit for Classification and Population Management at the Fresno County Jails?

A    Yes, there is a certain amount -- the officers have -- so the objective system gives you a suggested classification, and then the Classification officer can take into account other information that they may be aware of to override or assign a different classification level for that inmate.

Q    Is there a procedure or a policy regarding how those officers take into account other information they may be aware of to override or

REPORTER'S CERTIFICATE

OF

CERTIFIED SHORTHAND REPORTER

* * * * * *

I, THE UNDERSIGNED CERTIFIED SHORTHAND REPORTER, IN AND FOR THE STATE OF CALIFORNIA, DO HEREBY CERTIFY: THAT THE FOREGOING PROCEEDINGS WERE TAKEN BEFORE ME AT THE TIME AND PLACE THEREIN SET FORTH, AT WHICH TIME THE WITNESS WAS PUT UNDER OATH BY ME; THAT THE TESTIMONY OF THE WITNESS AND ALL OBJECTIONS AT THE TIME OF THE PROCEEDINGS WERE RECORDED STENOGRAPHICALLY BY ME AND WERE THEREAFTER TRANSCRIBED UNDER MY DIRECTION; THAT THE FOREGOING IS A TRUE RECORD OF THE TESTIMONY AND OF ALL OBJECTIONS MADE AT THE TIME OF THE PROCEEDINGS.

IN WITNESS WHEREOF, I HAVE SUBSCRIBED MY NAME ON:

DATE: _april 28 2021_.

_____

LESLIE L. WHITE, CSR NO. 4148

177

# WEAKLEY

# EXHIBIT 2

Case 1:18-cv-01615-LHR-EPG    Document 55-3    Filed 03/22/22    Page 22 of 89

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA - FRESNO DIVISION

ERNEST O'NEIL RANKIN BROCK,     )
                                )
          Plaintiff,            )
                                )
     vs.                        )  No. 1:18-cv-01615-DAD-EPG
                                )  Pages 178 - 350
COUNTY OF FRESNO on behalf of   )
FRESNO COUNTY SHERIFF'S         )
DEPARTMENT, and DOES 1-200,     )
inclusive,                      )
                                )
          Defendants.           )
_____)

          **Confidential pursuant to Protective Order**

             ZOOM VIDEOTAPED DEPOSITION OF

          RUSSELL DURAN, Volume II, a witness herein,

          called for examination by counsel for

          Plaintiff in the above-styled matter, the

          witness being duly sworn by Leslie L. White,

          CSR 4148, State of California, taken via Zoom

          videoconference, at 10:05 a.m., Wednesday,

          April 21, 2021, and the proceeedings being

          taken down by stenotype by Leslie L. White,

          CSR, and transcribed under her direction.

Trustpoint.One | Alderson.     www.trustpoint.one
www.aldersonreporting.com     800.FOR.DEPO
(800.367.3376)

APPEARANCES


On behalf of the Plaintiff:


          LAW OFFICES OF LOYST P. FLETCHER, ESQ.
          BY:  CAITLIN SCOTT, ESQ.
          BY:  LOYST P. FLETCHER, ESQ.
          555 West 5th Street
          35th Floor
          Los Angeles, California 90013
             TELEPHONE (424) 231-2864
             E-MAIL cscott@lpfletcherlaw.com
                     loyst@lpfletcherlaw.com
                     (Of record but not present)


                    -AND-


          On behalf of the Plaintiff:


          CHANDLER LAW
          BY:  STUART CHANDLER, ESQ.
          761 East Locust Avenue
          Suite 101
          Fresno, California 93720
             TELEPHONE (559) 431-7770
             EMAIL stuart@chandlerlaw.com



          On behalf of the Defendants:


          WEAKLEY & ARENDT APC
          BY:  JAMES WEAKLEY, ESQ.
          5200 North Palm Avenue
          Suite 211
          Fresno, California 93704
             TELEPHONE (559) 221-5256
             EMAIL jim@walaw-fresno.com



          Also Present:


                  CUTLER ANDRUS, Videographer

isn't something he reviewed, he can testify in his

individual capacity because this is outside the

scope of his designation.

MS. SCOTT:  And while Captain Duran is

reviewing this document, I just want to state for

the record that this is a document regarding

assistance for review of inmate classification tool,

and Captain Duran, who was previously a lieutenant,

is identified on this documentation.

And because he has been designated as the

witness -- the 30(b)(6) witness for classification

policies for the County of Fresno, it is plaintiff's

position that this is within the scope of the

designation for this witness, and it should be an

appropriate document to question this 30(b)(6)

witness on.

THE WITNESS:  Okay.  Without reading the

document word for word in its entirety, I have gone

through it and do recall this document.

(Exhibit 19 was marked

for identification.)

BY MS. SCOTT:

Q     Okay.  What is this document that I have

marked as Exhibit 19?

A     So the first page is a letter from Sheriff

Mims to a Mr. Michael Jackson, who is with the Federal Bureau of Prisons, working with the National Institute of Corrections, and a request to have our classification objective system and assessment tool reviewed and assessed.

And then it's -- the document then has on the third page, on FSO 904, is a response from Ms. Hardyman, who is a -- I believe she's a contracted person through NIC that does assessments for classification systems throughout the nation. I believe she's contracted to do that.

She actually came out and did an assessment of our system, and this was her response after she came out and did that. And then the rest of the document goes into her report and finalizes with some recommendations at the end.

Q    Okay. On the third page of this document, FSO 904, the letter that you were referring to from Patricia Hardyman is addressed to you.

Do you see that?

A    Yes.

Q    Do you know why that document was addressed to you from Ms. Hardyman?

A    After she came out, as she noted here -- it looks like she was out at our facility on

Trustpoint.One  Alderson.    www.trustpoint.one
www.aldersonreporting.com    800.FOR.DEPO
(800.367.3376)

Case 1:18-cv-01615-LHR-EPG    Document 55-3    Filed 03/22/22    Page 26 of 89

the earlier part of the decade, and just kind of

having the ability to separate that.

BY MS. SCOTT:

Q    Was Ms. Hardyman's involvement with the Fresno County Sheriff's Office in evaluating the jail in Fresno County a response to AB 109 or something else?

A    This -- her -- her involvement, the reason why she was -- came to do a review was we requested that specifically from the NIC.

When I was a lieutenant of the unit, just in operations of viewing our custody status, our classification tools, and talking to officers, and seeing the product, and seeing the history of it, and that there was really no review of it since 1991, that we -- I went to the Sheriff and actually said that it might be good to have someone come out and take a look at it.

And that's what prompted her -- or us to contact them, and she was the one that the NIC referred to to come out and provide that service.

As far as I know the NIC provides evaluations of systems to agencies across the country, when requested.

Q    When you said seeing the product, so you

said "talking to officers and seeing the product when you were a lieutenant," what do you mean by "seeing the product"?

A    Well, as we were seeing more inmates in our custody that would normally go to prison, and we were seeing an uptick, I will say, of inmates that caused more problems, that had more of a -- we had more fights in our custody or incidents because of those inmates staying in our custody longer, that we wanted to review it to see if there was things that we could do, or things that would be identified to help us mitigate that.

Q    When you say "more fights and more problems," was that a comparison with a different county, or was that a comparison with information that you had for the Fresno County Jail?

A    That was observations of our facilities prior to AB 109 versus after AB 109.

And in discussions with -- you know, we go to meetings periodically where other classification units from other agencies are there, and their discussions, and hearing that they were having the same issues that we were, just kind of in all those discussions kind of helped us -- helped me to want to look into seeing what we could do.

Case 1:18-cv-01615-LHR-EPG    Document 55-3    Filed 03/22/22    Page 28 of 89

believe.  It -- trying to remember, if it was around 2012, I believe, '12 or '13.  It was initiative that was passed by the State of California which shifted more state prison inmates to serve their time at county jails.

Prior to AB 109 most county jails sentences were up to one year.  If they were sentenced to longer than a year, then they usually were sentenced to serve their time at the state prison.

And that assembly bill changed it to where inmates sentenced up to three years could spend their time at county jails, and not just three years in totality.  It could be per conviction.

So we actually had some inmates that were sentenced to even serve up to a decade or so in county jail facilities.

Q    Okay.  Was anything done by the Fresno County Sheriff's Office as a result of the session meant that Ms. Hardyman conducted, in terms of classification policies for the Fresno County Jail facilities?

A    So after we received her assessment, the Sheriff's Office actually contracted with Ms. Hardyman to come out and help us -- come up with

Trustpoint.One  Alderson    www.trustpoint.one
www.aldersonreporting.com    800.FOR.DEPO
(800.367.3376)

an updated, or make suggestions to update our -- more specifically the assessment tool, and classification policy recommendations.

Which we did hire her, and she came out -- I don't even remember what the time frame was.  I want to say it was close to a year after this assessment before she was actually hired.

And then she came out and started working with our staff, and helped coming up with a new -- not a new assessment tool, an updated assessment tool that she -- we are still working today in conjunction with her, going back and forth and working on that assessment tool, to implement something that is not only effective, but able to work with our configuration of our jails, being that we have some configuration housing designs that not all jails deal with, since everything is structured differently.

So we are still working with her on that. And we have not yet finalized and implemented a final tool yet.

     Q    Okay.  I'm going to ask the videographer to -- and yourself as well Captain Duran, to turn to the sixth page of this exhibit.  At the bottom of the page, the Bates number is FSO 907.

the history of the person that they are classifying, whatever documented past notes they might have.

If they have access -- well, I shouldn't say that.  If it is already in the system, like the probable cause declaration of the arrest, if that has already been entered into the system, then they could review that.

On reassessment they can also look at the inmate's reports and rule violations written during their stay in custody.  They can review that. That's pretty much the majority of it.

Q    Is there anything specific about -- that the officers look at about the person who is already in the Fresno County Jail, that an inmate coming into the Fresno County Jail is evaluated for to determine whether they are the best fit for someone coming in?

A    Nothing specific like a list that they have to go through.

But the training and the direction on Classification officers is to look at whatever material or information they have available that they have access to to review.

And, you know, they are -- through their training they are shown those areas of the probable

Case 1:18-cv-01615-LHR-EPG    Document 55-3    Filed 03/22/22    Page 31 of 89

cause declaration, the Class notes, the reports, and they are shown where all that information is so that they have -- know that they have access to those areas to look at in order to make those decisions.

Q    So are the officers required to look at both parts of the -- are they required to look at both the inmate that is going to be assigned to be housed, as well as the inmate's history for where the incoming inmate is going to be housed with?  Is it a two-fold kind of analysis?

A    There is not a policy requirement that makes them do that, but that is part of the training and expectation is that they look at that information.

Q    Is there any -- so that's part of the training.  Is there any sort of oversight to ensure that that training is adhered to by Classification officers when they are assigning housing for inmates?

A    Like auditing?

Q    Yeah.  So is there a periodic review of officers to make sure that they have looked at all of that information, based on the training they are required to go through before they can start assigning inmates to housing units?

Case 1:18-cv-01615-LHR-EPG    Document 55-3    Filed 03/22/22    Page 32 of 89

A    Part of our training system, when a Classification officer comes in, you know, they are trained in the areas of classification over, I believe it's a 17-week period broken down into different sections of their training.

And, you know, early on in the training in the first few weeks they are there, their work is 100 percent reviewed by their training officer, and then as they get more experience and have shown to be proficient in the earlier stages, and they keep moving forward in their training, and eventually get to a point to where they do a majority of their work without somebody reviewing every piece of information.

And then we have a continued audit system that lead officers and sergeants randomly audit classifications for accuracy and correctness.

Q    When there is an altercation between inmates is there -- and it has been substantiated by an officer that there was, in fact, a physical altercation between two cell inmates, is there any part of the audit process that the County of Fresno looks at to make sure that the classification process and the housing assignment was done correctly, or in accordance with the training that

Trustpoint.One  Alderson.    www.trustpoint.one
www.aldersonreporting.com    800.FOR.DEPO
(800.367.3376)

Q    The annual skills training is that something that -- and I'm talking sort of pre-COVID because I know that a lot of things have changed now because of COVID and not being able to do things in person, as you know we're doing this via Zoom, so . . .

The annual skills training pre-COVID was that something that officers -- correctional officers could do in person, or were they doing those skills training online?

A    No, pre-COVID all skills training to my knowledge was done in person.

Q    So the classification and training as part of the annual skills training would be done in person pre-COVID?

A    That is correct.

Q    And you're saying Troy Burks would be the main instructor who would know whether the classification portion of an annual skills training for a correctional officer is elective or mandatory?

A    If he didn't know it off the top he would be able to find out that information, yes.

Q    Okay.  For Classification officers is there a required annual skills training specifically for classification purposes at the Fresno County

Trustpoint.One  Alderson.     www.trustpoint.one
www.aldersonreporting.com     800.FOR.DEPO
(800.367.3376)

Sheriff's Office?

A     So it's not tied into the skills training as the whole staff, but we do classification meetings periodically throughout the year.  We try to do them at least quarterly or every four months to try to -- and that's just with the Classification Unit and staff.  It doesn't involve other units or staff.

And we do that probably about a three- to four-hour meeting each time we meet to talk about classification topics or issues.

Q     How long has the Classification Unit been meeting quarterly or at least trying to meet quarterly?

A     They have been meeting -- ever since I was a Classification officer 15 years ago we used to have meetings.  I would say when I started it might have only been once or twice a year, and then as time went on it expanded to three or four times a year.

But I know over the last at least, I'll estimate and say the last eight years or so, it has been three to four times a year.

Q     Is there a reason that the meeting for classification increased over the period of time you

out what those charges are.

Is there a charge that is more common that would allow an inmate in the existing housing unit to be able to deduce what an incoming inmate has, in terms of their charges?

A    Maybe not a specific -- maybe not for them to be able to tell specifically what that charge most likely is, but they know kind of the types of charges -- the inmates know what types of charges we put in there.

They know that it is either going to be a sex-related charge, or a charge involving a minor. It could be abuse.  It could be elder abuse.

They know that those are probably the main categories of charges that are in that group.

Q    This may sound like a very basic question, but I just have to ask it, just for purposes of getting a clear record.

But why are those charges considered PC charges, for purposes of housing inmates at the Fresno County Jail?

A    Because based on our experience in talking to people, those are charges that people have that the General Population of jails and prisons don't take too likely to.

Case 1:18-cv-01615-LHR-EPG    Document 55-3    Filed 03/22/22    Page 36 of 89

And those inmates are more susceptible to being assaulted or confronted by inmates because of the nature of their charge.

Q    And that would be assault by who, more susceptible?  You're saying that those inmates would be more susceptible to certain things like assault.  Assaults by who would they be more susceptible to, within the Fresno County Jail?

A    General Population inmates.  Plus you have certain gangs that part of their gang creed or rules would be if you come across a child molester or some type of charge, they have to assault them, according to their gang.  So sometimes that you have dynamic.

Q    Okay.  For an inmate who comes into the Fresno County Jail during the classification process some of the -- well, one of the things that is noted is tattoo markings on an inmate's body; is that correct?

A    That is correct.

Q    And one of the purposes is noting the tattoos on an inmate's body are for purposes of gang affiliation; is that right?

A    That is correct.

Q    Other than gang affiliation for classification purposes, is there any other use for

Trustpoint.One  Alderson.        www.trustpoint.one
www.aldersonreporting.com        800.FOR.DEPO
(800.367.3376)

person a second time, they would be just given another rule violation for assault on inmate.

Q    Is there ever a point where Fresno County Sheriff's Office has criteria to determine that an inmate is deemed a danger to others and can't be housed with any other inmates, based on previous assaults or a singular assault?

A    That would be the determination of the Classification officers to make a decision whether that inmate needed to be housed alone, or if they are still going to continue to be housed with others.

Q    And that would be -- go ahead.

A    I want to make sure we don't confuse being determined to be a danger to others, like from a mental health perception or assessment to where that would require other mental health information, like a possible safety cell placement or something like that.

That mental health assessment and a determination "danger to others" is more specific.

Q    Right.  And I'm talking about in terms of previous assaults on other inmates where there have been so many assaults on other inmates that a particular inmate has been housed with such that it

Trustpoint.One  Alderson.    www.trustpoint.one
www.aldersonreporting.com    800.FOR.DEPO
(800.367.3376)

Case 1:18-cv-01615-LHR-EPG   Document 55-3   Filed 03/22/22   Page 38 of 89

rises to the level of an officer's determination that based on those previous assaults they can't be housed with any other inmates, and they need to be by themselves.

A      There is no clear-cut policy or unwritten policy that dictates a certain number of those incidents.  That is all strictly in the history and totality that a Classification officer is expected to review when making decisions.

So it is possible that one Classification officer may be reviewing a recent incident, and they make a determination that this person isn't going to be housed with anybody, or they are going to be re-classed to a single cell; whereas, another officer may not make that same decision.  There is nothing black and white that tells them they have to at this point.

Q      And you're talking about written or unwritten policies; right?  There is no written or unwritten ones regarding --

A      Not that I'm aware of.

Q      -- the housing?  Okay.

Is there any sort of practice that you're familiar with in the Fresno County Sheriff's Office that Classification officers follow to make that

Trustpoint.One  Alderson.
www.trustpoint.one
www.aldersonreporting.com
800.FOR.DEPO
(800.367.3376)

Case 1:18-cv-01615-LHR-EPG    Document 55-3    Filed 03/22/22    Page 39 of 89

determination?

A    The practice would be in the reinforcement from Population Management sergeants and --

(Reporter clarification.)

THE WITNESS:  And the lieutenant that I was for a period of time, that it is always reinforced with the officer to look at the totality of the history and the notes on their Class logs and the information that they can review in making the best decision possible.

BY MS. SCOTT:

Q    Outside of Fresno County Sheriff's Office policies of which you're not aware of any written or non-written policy, are you aware of any national standard for determining whether an inmate who has previously been disciplined for an inmate-on-inmate assault that prevents housing with another inmate of any kind?

A    Not that I'm aware of.

Q    Are you aware of any national policies or any other policies, outside of the Fresno County Sheriff's Office policies, regarding assault on other inmates by an inmate?

A    I'm sure that there are other policies from other facilities and how they handle things,

through classification policies and practices and procedures, so just that they are aware of the topics.

Q    Was there any -- when the legal update, when it refers to "Brock," that was in reference this case; is that correct?

A    Yes.

Q    Okay.  Was anything specifically addressed about the classification policies with respect to this case at that classification meeting in June of 2018?

A    I don't recall the specific information that was discussed at that meeting about this case. Yeah, I don't remember any specifics to it.

Q    Okay.  Was there anyone besides Classification officers, or someone within the Classification Unit that attended that meeting in June of 2018?

A    No.

Q    During any classification meetings after the incident that occurred between Luna and my client, Mr. Brock, was any sort of review performed by Fresno County, or the Fresno County Sheriff's Office regarding the classification of either Mr. Brock or Mr. Luna, in terms of how they ended up

Case 1:18-cv-01615-LHR-EPG    Document 55-3    Filed 03/22/22    Page 41 of 89

in a cell together?

A    Yes, there was a Classification Review done by Sergeant Ibal.

Q    Do you know what that review entailed?

A    So the Classification Review is a document -- the purpose of it is for us to review that the classification was done correctly, and the housing assignment is done appropriately.

And there is other information.  It kind of talks -- it goes into like the initial booking and arrest information and classification interview of the inmates involved.

I know it is one of the documents that has been produced.  I don't know if it's something you want to pull up and talk about, and I can tell you exactly what is all in there.

But it also lists like kind of a summary of their incidents or movement in custody throughout the document.

Q    Do you have that document accessible to you?

A    If you give me one sec I can look for it.  Okay.  It looks like I have it.  It looks like it is Bates stamp FSO 467 through FSO 476.

Q    If want to go ahead and just pull up that

Case 1:18-cv-01615-LHR-EPG    Document 55-3    Filed 03/22/22    Page 42 of 89

Q    Yeah, if you need to review it before you give me an overview of what it is.  Ultimately I'd like to know what the conclusion was that Sergeant Ibal determined as a result of the classification investigation.

So if you know what the conclusion was before reviewing it, you can let me know.  But if you need to review the document before answering that question, feel free.

A    So if your question is what the conclusion was of it, I do -- is that the question?

Q    Yes.  Do you know what the conclusion is?

A    Yes.  So Sergeant Ibal concluded that the classification -- the classification was correct for the inmates.  But she goes on to talk about the decision for housing, and ultimately, in her final paragraph, she states, (Reading):

"At some point Luna should have been assigned to Administrative Segregation single cell status until Classification officers and/or Mental Health staff could assess the reasons for his inability to get along with other inmates.  Luna should not have had

Case 1:18-cv-01615-LHR-EPG    Document 55-3    Filed 03/22/22    Page 43 of 89

a cellmate until after the assessment took place."

That was her final conclusion

Q    So and I just want to make sure that I understand your testimony correctly.

With regard to the conclusions that Sergeant Ibal came to with respect to the placement and classification of Mr. Luna and Mr. Brock is that both were classified correctly.  Do I understand that to be your testimony?

A    Yes.

Q    However, the housing placement was incorrect in that Inmate Luna should have been placed in a single cell, so that he could be reclassified and further evaluated?

A    That is Sergeant Ibal's assessment of the classifications and housing, yes.

Q    Okay.  Did you perform any investigation into Sergeant Ibal's findings contained within this report?

A    So I reviewed this document.  I have actually -- I recall reviewing it several times over a couple-year period, referring to it and reading it.

I went through her listed entries that she

Trustpoint.One  Alderson.    www.trustpoint.one
www.aldersonreporting.com    800.FOR.DEPO
(800.367.3376)

Case 1:18-cv-01615-LHR-EPG    Document 55-3    Filed 03/22/22    Page 44 of 89

made in regards to the incidents that were documented on Mr. Luna, and so I am kind of familiar with what is listed in this document.  And I did look at it and review it to see what led to her conclusion.

Q    Did you make any -- well, did you formulate any opinion about whether her conclusion was correct or incorrect?

A    My formulated opinion was I agreed with her that that should have happened.

Q    Okay.  Would you agree that Sergeant Ibal's conclusion was that the incident which occurred between Inmate Luna and Mr. Brock was a preventable incident?

MR. WEAKLEY:  Object as vague.  Speculative.

THE WITNESS:  Based on the assessment and the outcome that they shouldn't have been housed together at that time, then, yes, that could have prevented the incident.

MS. SCOTT:  Okay.  I think right now we can take another 10-minute break.

THE WITNESS:  Thank you.

THE VIDEOGRAPHER:  We are going off the record.  The time is 3:56.

Trustpoint.One | Alderson    www.trustpoint.one
www.aldersonreporting.com    800.FOR.DEPO
(800.367.3376)

Case 1:18-cv-01615-LHR-EPG     Document 55-3     Filed 03/22/22     Page 45 of 89

an inter-office memo regarding a classification review entails.

A    So it would entail a review of the classification and housing of individuals involved. And we do these for all like inmates' in-custody deaths.  We do them for what we consider a significant or serious incident involving inmates. And just to do a -- a review of their -- a brief summary of the incident that happened, and go through each inmate's kind of summary of their initial classification, and the information that was documented.

And then it moves on into their classification entries from the Classification log that talks about their movement, their -- any incidents that were documented in the Class log, and just kind of summarizes that for the inmate.

And then it is -- at the end there is a conclusion to determine, to note if the classification was correct, or there was any issues identified with that.  And also if the housing seemed appropriate for the classification and the situation.

Q    Okay.  There are some signatures at the top of this document on the first page, FSO 467, and

next to the From line. Do you recognize those documents?

A     Yes.

Q     Whose signatures are those?

A     So the one at the top of the document next to the word "Memo," that is Captain Vega's signature. The signature under Sheriff/Coroner in blue ink is my signature, as Lieutenant Russell Duran. And then the signature -- or looks like initials is next to the From is Sergeant Ibal's. That's her signature or initials.

Q     Do you know why the signatures of those three people including yourself is on this document?

A     So when Sergeant Ibal wrote this document and finalized it and submitted it through the chain of command, she initialed it that that is her product, her document.

And then I would have -- I would be the next person in her chain of command as her lieutenant. So I signed off that I received it and read it.

And then I forwarded it to the next person in the chain of command, which is my captain, which was Captain Ron Vega at the time.

Q     How is this document maintained within the

Case 1:18-cv-01615-LHR-EPG    Document 55-3    Filed 03/22/22    Page 47 of 89

after an incident such as this occurred?

A    I wouldn't say that it is typical. Because a majority of information in here is taken directly from the inmate's classification screens. And really, other than that and the initial Class interview, it's really just documenting that and putting it together in the format.

And then the sergeant who is preparing it, formulating their conclusion. And so typically it is not -- doesn't take very long to put this document together.

Q    Other than being scanned into the laserfiche system, does this document go to anyone else besides the file for Luna or Brock?

A    No.

Q    What is the purpose of a Classification Review such as this?

A    It's just to review the inmates listed, review their classification, housing and movement during their stay in our custody, up to the point of the incident that is being reviewed, and to formulate a conclusion if the classification and housing was appropriate.

Q    Okay. So in this instance the classification for Luna was deemed appropriate; is

Case 1:18-cv-01615-LHR-EPG     Document 55-3     Filed 03/22/22     Page 48 of 89

REPORTER'S CERTIFICATE

OF

CERTIFIED SHORTHAND REPORTER

\* \* \* \* \* \* \*

I, THE UNDERSIGNED CERTIFIED SHORTHAND REPORTER, IN

AND FOR THE STATE OF CALIFORNIA, DO HEREBY CERTIFY:

THAT THE FOREGOING PROCEEDINGS WERE TAKEN BEFORE ME

AT THE TIME AND PLACE THEREIN SET FORTH, AT WHICH

TIME THE WITNESS WAS PUT UNDER OATH BY ME; THAT THE

TESTIMONY OF THE WITNESS AND ALL OBJECTIONS AT THE

TIME OF THE PROCEEDINGS WERE RECORDED

STENOGRAPHICALLY BY ME AND WERE THEREAFTER

TRANSCRIBED UNDER MY DIRECTION; THAT THE FOREGOING

IS A TRUE RECORD OF THE TESTIMONY AND OF ALL

OBJECTIONS MADE AT THE TIME OF THE PROCEEDINGS.

IN WITNESS WHEREOF, I HAVE SUBSCRIBED MY NAME ON:

DATE:  ___April 21, 2021_____.

LESLIE L. WHITE, CSR NO. 4148

# WEAKLEY

# EXHIBIT 3

Case 1:18-cv-01615-LHR-EPG    Document 55-3    Filed 03/22/22    Page 50 of 89

UNITED STATES DISTRICT COURT

EASTERN DISTRICT - FRESNO DIVISION

--oOo--

ERNEST O'NEIL RANKIN BROCK,        )
                                   )
            Plaintiff,             )
                                   )
       vs.                         ) No. 1:18-cv-01615-DAD-EPG
                                   )
COUNTY OF FRESNO on behalf of      )
FRESNO COUNTY SHERIFF'S            )
DEPARTMENT; and DOES 1-200,        )
inclusive,                         )
                                   )
            Defendants.            )
_____)

--oOo--

Zoom Videoconference

Videotaped Deposition of

CORPORAL TROY BURKS

Friday, July 16, 2021

--oOo--

Reported By:   Jolyne R. Simler, CSR License No. 10902

Case 1:18-cv-01615-LHR-EPG    Document 55-3    Filed 03/22/22    Page 51 of 89

A P P E A R A N C E S

For the Plaintiff:

    LAW OFFICES OF LOYST P. FLETCHER
    555 W. Fifth Street, 35th Floor
    Los Angeles, California 90013
    By:  LOYST P. FLETCHER, ATTORNEY AT LAW
    424.231.2864
    loyst@lpfletcherlaw.com

For the Defendants:

    WEAKLEY & ARENDT
    5200 N. Palm Avenue, Suite 211
    Fresno, California 93704
    By:  JAMES WEAKLEY, ATTORNEY AT LAW
    559.228.6204
    jim@walaw-fresno.com

Also Present:  Tom Rowles, Videographer
                Beverly Bell

--oOo--

Case 1:18-cv-01615-LHR-EPG    Document 55-3    Filed 03/22/22    Page 52 of 89

MR. FLETCHER:  Sure.

THE VIDEOGRAPHER:  Okay.  Now I see it.  Now it came.  Here you go.

MR. FLETCHER:  Thank you very much.  Okay.

Q.    Okay.  Corporal Burks, does this -- and you indicated you're in charge of additional training above and beyond the minimum requirements.

But this sets forth the policy and procedure regarding the minimal training requirements that correctional officers -- or I should say staff members -- correctional staff has to receive that you're -- and you're over that -- you're over that program; correct?

A.    Yes.

Q.    Okay.  Okay.  Does it differentiate -- does the minimal requirement differentiate by title or rank or everybody gets -- everybody has the same minimal requirement?

A.    For STC training for the State -- the standards and training for corrections, it's 24 hours for your line staff, your sergeants, your administration -- your administrators, which are your lieutenants.

Q.    Okay.

A.    And we -- also, captains have to have 24 hours for STC, along with their POST training as well.

Q.    Okay.  So I -- I -- I think I'm

Case 1:18-cv-01615-LHR-EPG     Document 55-3     Filed 03/22/22     Page 53 of 89

misunderstanding.

Is everybody the same or it -- it differentiates between rank and title?

A.    For corrections, you're -- for STC for 24 hours, everyone needs to receive training for 24 hours.

Q.    Okay.  Is that the same --

A.    Because, again, your lieutenants can have different training than your line staff, as long as they're getting 24 hours of STC training.

Q.    Okay.  So it's -- there are different subject matters is what you're saying.

A.    Correct.  Yes.

MR. FLETCHER:  Okay.  Okay.  If you could turn to FSO 11145 in that document, Mr. Videographer.

MR. WEAKLEY:  It would just be the next page.

MR. FLETCHER  Q:  Section B, Corporal Burks, that was what you were referring to earlier?  You said first aid, CPR, ADA, mental illness, and --

A.    Yes.

Q.    -- PREA; right?

A.    What you're seeing is the officer enhancement training.  That comes after the academy.

Q.    Okay.  When you say "after the academy," what do you mean?  When you say "academy," what do you mean by "academy"?

CERTIFICATE OF CERTIFIED SHORTHAND REPORTER

I, JOLYNE R. SIMLER, a Certified Shorthand Reporter, licensed by the State of California, being empowered to administer oaths and affirmations pursuant to Section 2093(b) of the Code of Civil Procedure, do hereby certify:

That the witness named in the foregoing deposition was present at the time and place specified;

That the witness was by me sworn to testify to the truth, the whole truth, and nothing but the truth;

That the said proceeding was taken before me in shorthand writing, and was thereafter transcribed, under my direction, by computer-assisted transcription;

That the foregoing transcript constitutes a full, true, and correct record of the proceedings which then and there took place;

That I am a disinterested person to the said action;

IN WITNESS WHEREOF, I have hereunto subscribed my signature on this _____28th_____ day of _____July_____, 2021.


JOLYNE R. SIMLER
California CSR #10902

# WEAKLEY

# EXHIBIT 4

Case 1:18-cv-01615-LHR-EPG    Document 55-3    Filed 03/22/22    Page 56 of 89

UNITED STATES DISTRICT COURT

EASTERN DISTRICT - FRESNO DIVISION

--oOo--

ERNEST O'NEIL RANKIN BROCK,    )
                               )
            Plaintiff,         )
                               )
     vs.                       ) No. 1:18-cv-01615-DAD-EPG
                               )
COUNTY OF FRESNO on behalf of )
FRESNO COUNTY SHERIFF'S        )
DEPARTMENT; and DOES 1-200,    )
inclusive,                     )
                               )
            Defendants.        )
_____)

--oOo--

Zoom Videoconference

Videotaped Deposition of

SERGEANT MARY NICHOLS

Friday, July 16, 2021

--oOo--

Reported By:   Jolyne R. Simler, CSR License No. 10902

Case 1:18-cv-01615-LHR-EPG    Document 55-3    Filed 03/22/22    Page 57 of 89

A P P E A R A N C E S

For the Plaintiff:

     LAW OFFICES OF LOYST P. FLETCHER
     555 W. Fifth Street, 35th Floor
     Los Angeles, California 90013
     By:  LOYST P. FLETCHER, ATTORNEY AT LAW
     424.231.2864
     loyst@lpfletcherlaw.com

For the Defendants:

     WEAKLEY & ARENDT
     5200 N. Palm Avenue, Suite 211
     Fresno, California 93704
     By:  JAMES WEAKLEY, ATTORNEY AT LAW
     559.228.6204
     jim@walaw-fresno.com

Also Present:  Tom Rowles, Videographer
                Corporal Troy Burks
                Beverly Bell

--oOo--

Trustpoint.One | Alderson.
www.trustpoint.one
www.aldersonreporting.com
800.FOR.DEPO
(800.367.3376)

Case 1:18-cv-01615-LHR-EPG    Document 55-3    Filed 03/22/22    Page 58 of 89

A.    In Phase II, Week 2, it is a -- it's not shadowing.  They're actually performing their job duties alongside a trainer.

Q.    Well, that sounds like shadowing to me. What --

A.    Shadowing is -- it would not be doing any hands-on if they're just shadowing.  They're actually performing duties.  So hands -- hands-on training.

Q.    Okay.  Gotcha.  So it's kind of on-the-job training.

A.    Correct.

Q.    Okay.  And is there a program -- well, strike that.

How would you implement training special handling of inmates on an on- -- on-the ground -- I'm sorry -- on an on-the-job training situation identifying psychologically-impaired inmates?  I mean, what -- how do you -- how do you set that up?

A.    So the trainers have policy that we have that is provided to them that they go through the policies; they talk that out with the trainee.  The training unit has provided training information regarding stuff like that.  That is also information that is utilized by the trainers to the trainees.

Q.    Okay.  The protective custody designation, what

Case 1:18-cv-01615-LHR-EPG    Document 55-3    Filed 03/22/22    Page 59 of 89

you know, how this seven-week training program works. And these are checklists.

Is this something that's done, you know, chronologically, or is it just -- you know, how -- how do you handle it?  How do you go through this checklist, and how you check this stuff off?  What's the process?

A.    I'll give you -- let me give you a little -- just a quick overview of how, like, the weeks work. Would that be --

Q.    That would help.  Thank you.

A.    So after they first get hired, the very first week is their orientation week.  The second week is a shadow week where they just are watching and observing. They will not participate.  But they watch on the floor with the trainer.

Then they will start the Phase I, and that's a seven-week period.  And during that seven weeks, they go through the checklist.  And every week they build on being on the floor, learning the information, reading the policy.  And at the end of the phase, they take a written test to see that they retained the knowledge that they learned during the first seven weeks.

Then once they successfully pass that test, they will start Phase II.  Phase II is an additional seven weeks.  It is exactly like Phase I as far as how it's

laid out weekly, but the information is a little bit more detailed, more in-depth -- I should say more in-depth. And it builds on the knowledge of their policy. It builds on their knowledge and experience that they've been learning. And at the end of that phase, they, again, take a test to see -- to ensure that they've learned that information.

And then they start Phase III, which is a 12-week period. They do not get a weekly evaluation. They get a monthly evaluation for the next -- for the 12 weeks. And at the end of 12 weeks, then they have an end-of-phase saying that they successfully passed that third phase. And then for the rest of the year, they get monthly evaluations. And also during that time, they will go to the CORE academy.

Q.   Okay.  So there's a seven-week program, and then there's a 12-week program.

A.   There's two seven-week programs, and then there's two weeks that is part of the program, but they're not phase training.  It's the orientation week and a shadow week.

Q.   Okay.  So when you say "12 weeks," you're referring to the totality of the training.

A.   No.  So there's two weeks in the beginning.

Q.   Okay.

Case 1:18-cv-01615-LHR-EPG    Document 55-3    Filed 03/22/22    Page 61 of 89

A.    Then they get their -- so two weeks.  And then there's seven weeks of Phase I, then seven weeks of Phase II, and then 12 weeks of Phase III.  So that would be 28 weeks total.

Q.    Gotcha.  Okay.  That clarifies things.  Okay.  And I didn't -- you know, I see the Phase I week -- Week 3.  So you -- so the first seven weeks is Phase I; right?

A.    Correct.  It's...

Q.    And the seven -- and the second seven weeks is Phase II; right?

A.    Correct.

Q.    Okay.  And then -- and then there's a 12-week program.

A.    Correct.

Q.    Okay.  And during any one of these sequences, they could complete the CORE training, depending on when they were hired; right?

A.    Well, they would stop their phase -- because we still want them to go back to do the on-the-job.  So they could be -- say they've completed four weeks of Phase I, and then the CORE is going to stop -- start.

So we will stop Phase I at wherever week they're at, and then they will start the CORE.  And they will come back and restart the program up.

CERTIFICATE OF CERTIFIED SHORTHAND REPORTER

I, JOLYNE R. SIMLER, a Certified Shorthand Reporter, licensed by the State of California, being empowered to administer oaths and affirmations pursuant to Section 2093(b) of the Code of Civil Procedure, do hereby certify:

That the witness named in the foregoing deposition was present at the time and place specified;

That the witness was by me sworn to testify to the truth, the whole truth, and nothing but the truth;

That the said proceeding was taken before me in shorthand writing, and was thereafter transcribed, under my direction, by computer-assisted transcription;

That the foregoing transcript constitutes a full, true, and correct record of the proceedings which then and there took place;

That I am a disinterested person to the said action;

IN WITNESS WHEREOF, I have hereunto subscribed my signature on this ____28th____ day of ____July____, 2021.


JOLYNE R. SIMLER
California CSR #10902

# WEAKLEY

# EXHIBIT 5

Case 1:18-cv-01615-LHR-EPG    Document 55-3    Filed 03/22/22    Page 64 of 89

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA - FRESNO DIVISION

ERNEST O'NEIL RANKIN BROCK,           )
                                      )
              Plaintiff,              )
                                      )
      vs.                             )   No. 1:18-cv-01615-DAD-EPG
                                      )   Pages 1 - 100
COUNTY OF FRESNO on behalf of         )
FRESNO COUNTY SHERIFF'S               )
DEPARTMENT, and DOES 1-200,           )
inclusive,                            )
                                      )
              Defendants.             )
_____)

ZOOM VIDEOTAPED DEPOSITION OF

STEPHEN McCOMAS, Volume I, a witness herein,

called for examination by counsel for

Plaintiff in the above-styled matter, the

witness being duly sworn by Leslie L. White,

CSR 4148, State of California, taken via Zoom

videoconference, at 9:19 a.m., Tuesday,

March 30, 2021, and the proceeedings being

taken down by stenotype by Leslie L. White,

CSR, and transcribed under her direction.

Case 1:18-cv-01615-LHR-EPG    Document 55-3    Filed 03/22/22    Page 65 of 89

Q    Earlier in your deposition testimony you mentioned that you have the contract between -- you mentioned that you had a binder that was on your desk; correct?

A    That's correct.

Q    Okay.  And that binder is a contract between Fresno County Jail and one of the medical service providers; right?

A    It's between the County of Fresno and the medical service provider.

Q    Okay.  And is that between Corizon or between someone else, or some other entity?

A    It's between Corizon and the County of Fresno.

(Reporter clarification.)

BY MS. SCOTT:

Q    Is there -- well, Corizon no longer provides services to inmates at the Fresno County Jail; is that right?

A    That's correct.

Q    Is there a reason that you have that particular binder between the Fresno -- between Fresno County and Corizon on your desk?

A    Because at the time of the incident regarding this deposition they were our medical



Case 1:18-cv-01615-LHR-EPG    Document 55-3    Filed 03/22/22    Page 66 of 89

provider, medical/mental health provider in the jail.

Q    So did you have that binder on your desk prior to --

(Audio interruption.)

THE WITNESS:  Sorry, I couldn't hear you.

(Reporter clarification.)

BY MS. SCOTT:

Q    -- prior to being notified about this particular lawsuit?

A    I'm -- repeat the question.  I'm sorry, prior to --

Q    So you said that you had that binder on your desk in your office at work; right?

A    No, I printed out -- I have a copy of the contract electronically.  Most everything now is electronic.

But when I realized I wouldn't be doing this deposition from my office, I printed a copy, so I could bring with me for this deposition in case I needed to refer to it.

Q    Okay.  Okay.  During the time frame -- well, strike that.

You began your role and your responsibilities as a captain in the Fresno County

REPORTER'S CERTIFICATE

OF

CERTIFIED SHORTHAND REPORTER

\* \* \* \* \* \*

I, THE UNDERSIGNED CERTIFIED SHORTHAND REPORTER, IN AND FOR THE STATE OF CALIFORNIA, DO HEREBY CERTIFY: THAT THE FOREGOING PROCEEDINGS WERE TAKEN BEFORE ME AT THE TIME AND PLACE THEREIN SET FORTH, AT WHICH TIME THE WITNESS WAS PUT UNDER OATH BY ME; THAT THE TESTIMONY OF THE WITNESS AND ALL OBJECTIONS AT THE TIME OF THE PROCEEDINGS WERE RECORDED STENOGRAPHICALLY BY ME AND WERE THEREAFTER TRANSCRIBED UNDER MY DIRECTION; THAT THE FOREGOING IS A TRUE RECORD OF THE TESTIMONY AND OF ALL OBJECTIONS MADE AT THE TIME OF THE PROCEEDINGS.

IN WITNESS WHEREOF, I HAVE SUBSCRIBED MY NAME ON:

DATE: _April 6, 2021_ .

_____

LESLIE L. WHITE, CSR NO. 4148

# WEAKLEY

# EXHIBIT 6

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

_____
                                )
ERNEST O'NEIL RANKIN      )
BROCK,                     )
                           )
          Plaintiff,       )
                           ) Case No.
     vs.                   ) 1:18-CV-01615-DAD-EPG
                           )
COUNTY OF FRESNO on        )
Behalf of FRESNO COUNTY    )
SHERIFF'S DEPARTMENT; and )
DOES 1-200, inclusive,     )
                           )
          Defendants.      )
_____)

          VIDEOTAPED DEPOSITION OF ERNEST BROCK, JR.,

commencing at the hour of 10:00 A.M., Monday, July 5, 2021,

before Stacy Banks, Certified Shorthand Reporter in and for

the State of California.

Ernest Brock, Jr.                                                         July 5, 2021

APPEARANCES:

FOR THE PLAINTIFF:

         The Law Offices of Loyst Fletcher
         BY: Loyst P. Fletcher, Esq.
         555 West 5th Street, 35th Floor
         Los Angeles, California   90013
         424.231.2864
         loyst@lpfletcherlaw.com

FOR THE DEFENDANT:

         Weakley & Arendt
         BY: James D. Weakley, Esq.
         5200 N. Palm Avenue, Suite 211
         Fresno, California   93704
         559.221.5256
         Jim@walaw-fresno.com

ALSO PRESENT:

         Matt Miller, Videographer
         Beverly Bell

Ernest Brock, Jr.                                          July 5, 2021

A.    Yes.

Q.    So I'm talking about the first time.

A.    Okay.  The first time, yeah.  Yeah, they showed up -- I was at the house.  It was about 7:00 a.m.  I heard somebody on the front porch and I turned around and look and there's tons of cops on the front porch.  They just knocked on the door.  I let them in.  They came in and sat me on the couch, went through the whole house looking for everything.  Didn't tell me nothing for about two hours and then I found out what was going on after that, so.

Q.    Was that the Fresno Police Department?

A.    Sheriff, Fresno, I believe F.B.I.  Yeah, it was a lot.

Q.    Okay.

A.    More overwhelming.

Q.    Was this --

A.    There might have even been one on my roof honestly for a kid.  They all had like their AR's or whatever, assault rifles and such.  A little overkill there, but.

Q.    Now, let's talk about -- is this March of 2017 when he was first arrested?

A.    Honestly I don't remember the exact date.  I just remember the incident.

Q.    Okay.  Do you know why he was arrested?

A.    They said what he was arrested for, yeah.

Q.    What did they say he was arrested for?

A.    He was involved in something over the Internet to do with children, yeah.

Q.    Some child pornography?

A.    Yeah, definitely.

Q.    And did he ever admit to you that he --

A.    I never -- no, he never admitted to me.  I never asked, so.

Q.    Did he have his own laptop at that time?

A.    I believe so.

Q.    And did you ever look at what he was doing on the laptop?

A.    Never.

Q.    Did anybody else have access to that laptop?

A.    That I don't know.  I mean he had friends over. Could have been possible.  Honestly I don't know.

Q.    Do you know the password to his laptop?

A.    No.

Q.    Is that the same -- well, no, he told us that he has a computer now, but he doesn't know the password.

A.    We were going to Zoom meeting yesterday and he can't remember the password to even get in it, so yeah.

Q.    You were in a Zoom meeting?

A.    We had a Zoom meeting yesterday.

Q.    Did you use that computer?

Ernest Brock, Jr.                                              July 5, 2021

STATE OF CALIFORNIA )
                    )
COUNTY OF FRESNO    )

I, STACY BANKS, a Certified Shorthand Reporter of the State of California having offices located at Fresno, California, do hereby certify;

THAT the witness in the foregoing deposition, named ERNEST BROCK, JR., was by me duly sworn to testify to the truth, the whole truth and nothing but the truth for the taking of the testimony herein;

THAT said deposition was reported in shorthand by me at the time and place above stated and thereafter transcribed under my direction and control.

I FURTHER CERTIFY that I am not interested in the outcome of said action, nor connected with, nor related to any of the parties in said action nor to their respective counsel.

DATED:   JULY 8, 2021

_____
STACY BANKS, C.S.R. No. 9343

# WEAKLEY

# EXHIBIT 7

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

_____
                                 )
ERNEST O'NEIL RANKIN        )
BROCK,                      )
                            )
          Plaintiff,        )
                            )  Case No.
     vs.                    )  1:18-CV-01615-DAD-EPG
                            )
COUNTY OF FRESNO on         )
Behalf of FRESNO COUNTY     )
SHERIFF'S DEPARTMENT; and )
DOES 1-200, inclusive,      )
                            )
          Defendants.       )
_____)

          VIDEOTAPED DEPOSITION OF TABITHA RANKIN, commencing

at the hour of 12:52 P.M., Monday, July 5, 2021, before Stacy

Banks, Certified Shorthand Reporter in and for the State of

California.

APPEARANCES:

FOR THE PLAINTIFF:

          The Law Offices of Loyst Fletcher
          BY: Loyst P. Fletcher, Esq.
          555 West 5th Street, 35th Floor
          Los Angeles, California  90013
          424.231.2864
          loyst@lpfletcherlaw.com

FOR THE DEFENDANT:

          Weakley & Arendt
          BY: James D. Weakley, Esq.
          5200 N. Palm Avenue, Suite 211
          Fresno, California  93704
          559.221.5256
          Jim@walaw-fresno.com

ALSO PRESENT:

          Matt Miller, Videographer
          Beverly Bell

Tabitha Rankin                                                    July 5, 2021

A.    No.

Q.    Has Ernie gone by any other names other than Ernest McNeal Rankin Brock?

A.    Ernest O'Neal Rankin Brock.

Q.    Yes.

A.    No.

Q.    You understand that Ernie was arrested in August of 2017?

A.    Yes.

MS. BELL:  Huh-uh.

MR. WEAKLEY:  What was the date?

MS. BELL:  March.

MR. WEAKLEY:  Q.  Let me restate the question.  You understand that Ernie was arrested in March of 2017.

A.    He was arrested in February.

Q.    Well, he was arrested twice, right?

A.    Okay.  Yes.

Q.    The first time?

A.    Okay.  Yes, in March, correct.

Q.    The first time he was arrested was in March of 2017?

A.    Correct.

Q.    Were you, were you with him when he was arrested?

A.    I was not the first time.

Q.    Okay.  How did you learn about his arrest the first

Tabitha Rankin                                           July 5, 2021

time?

A.   His father.

Q.   What -- did his father tell you that he was --

A.   Yes.

Q.   What did he tell you?

A.   He told me that he had been arrested.

Q.   Did he tell you why?

A.   Not exactly, no.

Q.   Have you ever learned why he was arrested the first time?

A.   I have learned.

Q.   What did you learn?

A.   What assumption he was accused of.

Q.   What was he accused of as far as you're aware?

A.   Child pornography.

Q.   Had you ever known Ernie to look at child pornography?

A.   No.

Q.   Did Ernie have his own laptop at that time?

A.   He did.

Q.   Did anybody else have access to that laptop?

A.   Not that I'm aware of.

Q.   Do you know who arrested him, what agency?

A.   I can't remember their name.

Q.   What were you told about the circumstances of him

Tabitha Rankin                                                    July 5, 2021

A.   I have not.

Q.   Do you know how long he was in jail the first time?

A.   It was less than 72 hours because they had to release him because no charges were filed.  And I picked him up from the jailhouse when he was released.

Q.   They had to release him?

A.   Well, they released him because there was no charges filed.  And I believe that he didn't do anything to have those charges filed.

Q.   Did you visit him while he was in jail the first time?

A.   I did not.

Q.   Did you have any phone calls with him when he was in jail the first time?

A.   I did not.

Q.   You picked him up at the jail, though, right?

A.   I did.

Q.   Did he live with you at the time that he was arrested the first time?

A.   No.

Q.   Did he live with you between the time he was arrested the first time and he was arrested the second time?

A.   No.

Q.   And my understanding is he was arrested the second time in January of 2018.  Does that sound right?

Tabitha Rankin                                                    July 5, 2021

A.    Correct.

Q.    Do you know why he was arrested the second time?

A.    They said it was a failure to appear and he never knew he had court on that date.

Q.    How do you know that he never knew?

A.    He never received anything or else he would have told me and I would have tooken him to court.

Q.    So did he ever tell you that he did not know that he had court?

A.    He didn't even know that he had court because they just showed up at his dad's work looking for him.

Q.    Did Ernie ever tell you that he didn't know that he was supposed to be in court?

A.    Correct.

Q.    Other than those two occasions are you aware of Ernie ever being arrested on any other occasion?

A.    No.

Q.    On the second occasion when he was in the jail did you ever go visit him?

A.    I did.

Q.    Pardon?

A.    Yes, I did.

Q.    How many times?

A.    Once.

Q.    How soon after he first went into the jail was it

Tabitha Rankin                                                    July 5, 2021

STATE OF CALIFORNIA  )
                     )
COUNTY OF FRESNO     )

          I, STACY BANKS, a Certified Shorthand Reporter of

the State of California having offices located at Fresno,

California, do hereby certify;

          THAT the witness in the foregoing deposition, named

TABITHA RANKIN, was by me duly sworn to testify to the truth,

the whole truth and nothing but the truth for the taking of

the testimony herein;

          THAT said deposition was reported in shorthand by

me at the time and place above stated and thereafter

transcribed under my direction and control.

          I FURTHER CERTIFY that I am not interested in the

outcome of said action, nor connected with, nor related to

any of the parties in said action nor to their respective

counsel.


DATED:   JULY 8, 2021




                    _____
                    STACY BANKS, C.S.R. No. 9343

# WEAKLEY

# EXHIBIT 8

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| ERNEST O'NEIL RANKIN BROCK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| vs. | ) | Case No. |
| | ) | 1:18-CV-01615-DAD-EPG |
| COUNTY OF FRESNO on behalf of | ) | |
| FRESNO COUNTY SHERIFF'S | ) | |
| DEPARTMENT; and DOES 1-200, | ) | |
| inclusive, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |


VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF KAREN NORRIS

Wednesday, July 7, 2021, 10:00 a.m.

Parkersburg, West Virginia


Reported By:
MELISSA SLOVER, CSR
License No. 9787

A P P E A R A N C E S


     JAMES D. WEAKLEY, Attorney at Law, of Weakley
& Arendt, APC, 5200 North Palm Avenue, Suite 211,
Fresno, California  93704, 559.221.5256, appeared (via
Zoom) as counsel on behalf of Defendant Fresno County
and Fresno County Sheriff's Department.
jim@walaw-fresno.com


       LOYST P. FLETCHER, Attorney at Law, of the Law
Offices of Loyst P. Fletcher, 555 West 5th Street, 34th
Floor, Los Angeles  90013, 424.231.2864, appeared (via
Zoom) as counsel on behalf of Plaintiff Ernest O'Neil
Rankin Brock.  loyst@lpfletcherlaw.com


Also Present:  Matt Miller, Videographer

was injured -- because I work downtown in the city and I wanted him to go to that, what is it, Cesar Chavez School.  I believe that was like a school for people, you know, it's an adult school.  That's what he would have to have done because he was already an adult at that time.

Q.  Do you know if he did anything to try to get into school?

A.  No, I don't know.  He didn't tell me when I encouraged him.  That was only a short period of time.

Q.  When you tried to encourage him, what did he say or do?

A.  What did he say or do?

Q.  Yes.

A.  We only talked about it.  He never said no, but he never said yes, so I can't remember the exact conversation.  That was so long ago.

Q.  Do you know just before -- let me back up for a second.  Were you arrested -- were you aware of the first time Ernie was arrested?

A.  So the first time that Ernie was arrested, I was at a conference in Sacramento and I received a phone call from my son, his dad, telling me that they had come to the house and arrested him.  Because I was living there at the time, and I was gone.  I came back

Karen Norris                                                July 7, 2021

home, and he was back home by then.

Q.   Okay.   Did you have an understanding why he was arrested?

A.   I was told -- I guess I knew the gist of it.   I was told everything was dropped.

Q.   Were you told why he was actually arrested?

A.   What my son told me.   I never saw any paperwork.

Q.   What did your son tell you?

A.   That he was arrested for pornography related to his computer through his laptop at the time.

Q.   Child pornography?

A.   I believe so, yes.

Q.   He had his own laptop, didn't he?

A.   At that time he did.

Q.   Did anyone else have access to his laptop that you're aware of?

A.   I certainly did not.   I have my own laptop.   I would have no reason to access his.   If his dad or his mother or anyone else did, I'm not aware.

Q.   At that time who was living in the mobile home with you guys, with you and Ernest Jr. -- I'm sorry.   Let me back up.

A.   Right.   Both of them --

Q.   I'm sorry?

A.   Me, Ernie and my son Ernest Jr.

Karen Norris                                                      July 7, 2021

responsible for everything that he did or did not do.
I worked 60 hours a week and I -- that was -- I did not
get involved in any of that.

Q.   I understand the first time he was arrested was
in March of 2017.  Does that sound about right?

A.   I would say so.  That sounds about when I went
to that conference.

Q.   Before he was arrested the second time, did he
ever tell you anything about being in the Fresno jail?

A.   No.  We didn't discuss any of it.

Q.   At the time that he was arrested the first time
in March of 2017, can you describe what Ernie's daily
routine was?

A.   Prior to his arrest?

Q.   Yes.

A.   Well, I worked from 8:00 in the morning until
7:00 or 8:00 at night pretty much every day, five days
a week during -- I handled the financials, the budget
system for our department.  For four months out the
year I worked 12, 14-hour days and would work six days
a week, so when I would come home, I would be
exhausted.  He was always in his bedroom playing his
video games, or at least that's what I believed he was
doing because he rarely came out of his room.  So that
was how our daily lives were.  My son still lived with

Karen Norris                                                    July 7, 2021

Q.   I think we have a double negative, so let me ask it again.  Is it correct that Ernie never expressed a desire to go back to school?

A.   That is correct.

Q.   Thank you.  The second time that Ernie was arrested was in January of 2018.  Does that sound correct?

A.   Yes.

Q.   Were you around when he was arrested the second time?

A.   I was at work.  I had already gone to work when that happened.  I got a phone call at work.

Q.   Okay.  Between the first time that Ernie was arrested and the second time that Ernie was arrested, did he ever express a desire to you to go back to school?

A.   I was the one encouraging him to go back to school prior to that second arrest for the last several months prior to that.  I truly believed that I would have been able to convince him, but we never got that opportunity.

Q.   I appreciate -- I understand you were trying to encourage him.  Did Ernie ever -- again, this was before his second arrest in January of 2013.  Did Ernie ever express a desire to go back to school?

State of California,

County of Tulare.


I, MELISSA SLOVER, License No. 9787, a
Certified Shorthand Reporter of the State of
California, do hereby certify:

That the witness in the foregoing deposition
was present at the time and place therein specified;

That the said proceeding was taken before me
as a Certified Shorthand Reporter at the said time and
place and was taken down in shorthand writing by me;

That the said proceeding was thereafter under
my direction transcribed with the use of
computer-assisted transcription, and that the foregoing
transcript constitutes a full, true and correct report
of the proceedings which then and there took place;

That I am a disinterested person to the said
action.

IN WITNESS WHEREOF, I have hereunto subscribed
my hand this 19th day of July, 2021.

_____
Melissa Slover
C.S.R. No. 9787